UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ANTOWAN THORNE,

        Plaintiff,

v.                                            Case No. 5:21-cv-321-BJD-PRL

R.C. CHEATHAM, et al.,

        Defendants.
_____

# ORDER

## I. Status

Plaintiff, Antowan Thorne, is a federal inmate proceeding on a third amended complaint against four federal officials under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971)[1] (Doc. 13; Am. Compl.). Defendants collectively move to dismiss the complaint (Doc. 29; Def. Mot.). Plaintiff opposes the motion (Doc. 31; Pl. Resp.).

## II. Motion to Dismiss Standard

A defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In

---

[1] In *Bivens*, the Supreme Court recognized an implied right of action for damages against a federal agent who, acting under "color of his authority," violated the plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. 403 U.S. at 389, 397.

ruling on such a motion, the court must accept the plaintiff's allegations as true, liberally construing those by a plaintiff proceeding *pro se*, but need not accept as true legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Though detailed factual allegations are not required, Rule 8(a) demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* A plaintiff should allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### III. Complaint Allegations

Plaintiff's claims arise out of an injury he sustained at USP Coleman I in November 2018. *See* Am. Compl. at 4. He sues Warden R.C. Cheatham, Dr. M. Tidwell, Nurse B. Jackson, and Captain R. Dunbar for an alleged Eighth Amendment violation. *Id.* at 2-4. Plaintiff alleges he injured his right hand when he fell playing handball, and because he did not receive proper treatment, his hand, which turned out to be broken, "heal[ed] in a malunited position." *Id.* at 4-5. Plaintiff alleges a hand specialist recommended surgery on July 8, 2019, but the recommendation was not approved. *Id.* at 5, 12. According to Plaintiff, the lack of proper treatment caused permanent damage to his hand, including nerve damage, arthritis, numbness, and muscle damage. *Id.* at 12.

Plaintiff explains Warden Cheatham did not authorize or approve surgery as recommended by the specialist and did not "discipline staff to do what was needed [to treat his] injury"; Dr. Tidwell failed to follow up on the hand specialist's surgical recommendation and failed to order a brace or cast and proper pain medication; Nurse Jackson ignored Plaintiff's multiple requests for additional treatment; and Captain Dunbar failed to discipline staff or "tak[e] charge" when Plaintiff complained of pain for up to five months. *Id.* at 12-13.

## IV. Analysis

Defendants move to dismiss the complaint on the following grounds: Plaintiff failed to exhaust his administrative remedies; they are entitled to qualified immunity; and any supervisory or official-capacity claims are not cognizable under *Bivens*. Def. Mot. at 1-2. In response, Plaintiff says he did exhaust his administrative remedies, and he clarifies or reiterates the facts supporting his claims against each Defendant. *See* Pl. Resp. at 2-5.

### A. Exhaustion

The Prison Litigation Reform Act (PLRA) provides, "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of available administrative remedies is "a precondition to an adjudication on the

3

merits." *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008). *See also Jones v. Bock*, 549 U.S. 199, 211 (2007). While "the PLRA exhaustion requirement is not jurisdictional[,]" *Woodford v. Ngo*, 548 U.S. 81, 101 (2006), "exhaustion is mandatory . . . and unexhausted claims cannot be brought," *Pavao v. Sims*, 679 F. App'x 819, 823 (11th Cir. 2017)[2] (per curiam) (citing *Jones*, 549 U.S. at 211). "[F]ederal prisoners suing under *Bivens* . . . must first exhaust inmate grievance procedures just as state prisoners" suing under § 1983 must do. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *see also O'Brien v. Seay*, 263 F. App'x 5, 8 (11th Cir. 2008) (recognizing the PLRA exhaustion requirement applies to *Bivens* claims).

"[T]he PLRA . . . requires proper exhaustion," which means a prisoner must grieve his issues in compliance with the agency's procedural rules, so the agency has a "full and fair opportunity" to address a prisoner's issues on the merits. *Woodford*, 548 U.S. at 90, 93. To properly exhaust administrative remedies, a federal prisoner must complete a multi-tiered system as set forth in the Bureau of Prison's Administrative Remedy Program (ARP). *See* 28 C.F.R. §§ 542.10, 542.13-542.15; *see also Okpala v. Drew*, 248 F. App'x 72, 73 n.2 (11th Cir. 2007) (citing *Alexander v. Hawk*, 159 F.3d 1321, 1324 (11th Cir.

---

[2] Any unpublished decisions cited in this Order are deemed persuasive on the relevant point of law. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1061 (11th Cir. 2022).

1998)). First, with some exceptions, a prisoner must attempt an "informal resolution" by presenting an issue of concern to prison staff. 28 C.F.R. § 542.13. Next, a prisoner must seek relief from the warden by timely submitting an administrative remedy request using form BP-9. 28 C.F.R. § 542.14(a). Then, if an inmate is unsatisfied with the warden's response, he must timely submit an appeal to the regional director using form BP-10. 28 C.F.R. § 542.15(a). Finally, a prisoner must timely submit an appeal to the general counsel using form BP-11. *Id.*

When confronted with an exhaustion defense, courts in the Eleventh Circuit employ a two-step process:

> First, district courts look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true. . . . Second, if dismissal is not warranted on the prisoner's view of the facts, the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust.

*Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015) (internal citations omitted) (citing *Turner v. Burnside*, 541 F.3d 1077, 1082-83 (11th Cir. 2008)). Because failure to exhaust is an affirmative defense, the defendant bears the burden. *Turner*, 541 F.3d at 1082.

Under the first step of the *Turner* analysis, the Court must accept as true that Plaintiff exhausted his administrative remedies, as he asserts in his

complaint, *see* Am. Compl. at 7, and response, *see* Pl. Resp. at 2. *See Turner*, 541 F.3d at 1082-83. At the second step of the *Turner* analysis, the Court need not resolve factual disputes because there are none. Defendants concede Plaintiff timely and properly complied with the ARP. *See* Def. Mot. at 3-4, 7-8.[3] They argue, however, that the grievances Plaintiff filed were insufficient to exhaust the claims he raises in this case because he initiated the ARP before the surgical recommendation was made, and "the focus of [his administrative] remedy was to seek follow-up to the December 2018 x-rays." *Id.* at 7-8. They maintain that, to properly exhaust, Plaintiff had to have filed an administrative remedy specifically about the delay in scheduling the surgery once the surgical recommendation had been made. *Id.*

Defendants' argument is not well-taken. The PLRA does not mandate a certain level of specificity in prison grievance forms; rather, the applicable prison grievance procedure "define[s] the boundaries of proper exhaustion." *See Jones*, 549 U.S. at 218 ("Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'"). According to the grievance records, Plaintiff complained generally about treatment (or lack thereof) for his hand injury. *See* Doc. 1 at 10, 12. Plaintiff, therefore, alerted

---

[3] With his original complaint, Plaintiff included a copy of his grievances and responses. *See* Doc. 1 at 10-15. The responses show his grievances at each level were addressed on the merits. *Id.* at 11, 13, 15.

prison officials that he was displeased with the level of care he was receiving, affording them a chance to address and resolve his complaint before he initiated a civil rights action. *See Whatley*, 802 F.3d at 1208 ("The purpose of the PLRA's exhaustion requirement is to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case'."). As such, Defendants do not carry their burden to demonstrate a failure to properly exhaust, and their motion is due to be denied as to that argument.

## B. Qualified Immunity

Defendants invoke qualified immunity, contending Plaintiff does not allege a deliberate indifference claim against any of them. Def. Mot. at 11-12. Prison officials sued in their individual capacities are "entitled to qualified immunity for [their] discretionary actions unless [they] violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009)). Qualified immunity allows officers to exercise their official duties without fear of facing personal liability. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). The doctrine protects all but the plainly incompetent or those who knowingly violate an inmate's constitutional rights. *Id.*

7

Upon asserting a qualified immunity defense, a defendant bears the initial burden to demonstrate he was acting in his discretionary authority at the relevant times. *Dukes v. Deaton*, 852 F.3d 1035, 1041-42 (11th Cir. 2017). After that, the burden shifts to the plaintiff to point to allegations that, accepted as true, permit the inference the defendant violated a clearly established constitutional right. Plaintiff does not contest that Defendants were acting within their discretionary duties at the relevant times. But he asserts in his response that he properly alleges each Defendant was deliberately indifferent to his serious medical needs. Pl. Resp. at 2-5.

To state a deliberate-indifference claim, a plaintiff first must allege he had "an objectively serious medical need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).[4] "To qualify as a serious medical need, an injury or condition, if not treated, must create a substantial risk of serious harm." *Hinson v. Bias*, 927 F.3d 1103, 1122 (11th Cir. 2019) (quoting in part *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019)). Next, the plaintiff must "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010). Finally, the plaintiff must allege facts showing a causal

---

[4] Generally, when a plaintiff has a viable *Bivens* claim, a court will apply case law interpreting 42 U.S.C. § 1983. *See, e.g.*, *Solliday v. Fed. Officers*, 413 F. App'x 206, 209 (11th Cir. 2011).

8

connection between the defendant's conduct and his injury. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care . . . or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). However, "[a] prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). To sufficiently plead the second element (deliberate indifference), a plaintiff must do more than allege the care he received was "subpar or different from what [he] want[ed]." *Id.* In other words, "'deliberate indifference' entails more than mere negligence."[5] *Farrow*, 320 F.3d at 1245. As such, a complaint that a

---

[5] The Eleventh Circuit has been inconsistent in its articulation of the standard of culpability. For instance, some cases describe this element as requiring a showing of more than "mere negligence," *Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016), *abrogated on other grounds by Twombly*, 550 U.S. 544; *Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003); *McElligott*, 182 F.3d at 1255, while others describe this element as requiring a showing of more than "gross negligence," *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013); *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007). The court acknowledged this "tension within [its] precedent," noting as follows: "These competing articulations—'gross' vs. 'mere' negligence—may well represent a

medical provider negligently diagnosed or treated an injury "does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106, 107 (holding a prisoner failed to state a plausible claim where he alleged merely that more should have been done to diagnose his back injury and treat his pain). *See also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("[F]ederal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law.").

Stated another way, "[d]eliberate indifference is not about 'inadvertence or error in good faith,' but rather about 'obduracy and wantonness'—a deliberate refusal to provide aid despite knowledge of a substantial risk of serious harm." *Stone v. Hendry*, 785 F. App'x 763, 769 (11th Cir. 2019) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). When a plaintiff has received some treatment, he pleads a deliberate-indifference claim only by alleging facts showing the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).

---

distinction without a difference because . . . the Supreme Court itself has likened the deliberate-indifference standard to 'subjective *recklessness* as used in the criminal law.'" *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 n.2 (11th Cir. 2020) (emphasis in original). *See also Patel v. Lanier Cnty., Ga.*, 969 F.3d 1173, 1188 n.10 (11th Cir. 2020).

Even if a plaintiff alleges a medical provider or corrections officer had been deliberately indifferent to his serious medical needs, he must allege more to state a plausible claim against the employee's supervisor if the supervisor did not personally participate in the alleged violation. That is because a supervisor may not be held liable under *Bivens* on a theory of vicarious liability. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1860 (2017) ("[A] *Bivens* claim is brought against the individual official for his or her own acts, not the acts of others."). *See also Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).

Defendants do not dispute that Plaintiff's hand injury constituted a "serious medical need." *See* Def. Mot. at 10-11. Rather, they argue Plaintiff fails to allege they acted with deliberate indifference. *Id.* at 11. Because a deliberate-indifference claim has a state-of-mind component, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." *Id.* Similarly, "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions."

11

*Alcocer*, 906 F.3d at 951 (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

### i.   Dr. Tidwell

Plaintiff alleges Dr. Tidwell failed to "follow up on the hand specialist report . . . for surgery . . . caus[ing] delay." Am. Compl. at 12. He also asserts Dr. Tidwell did not prescribe anything to help prevent permanent damage or ease his pain, such as a brace/cast and "proper pain medication." *Id.* Despite the Court having directed Plaintiff to amend his claims to clearly describe how each named Defendant was responsible for a constitutional violation, *see* Order (Doc. 7), the facts in the operative complaint are rather minimal. With his original complaint (Doc. 1), however, Plaintiff provided some medical and grievance records, which provide a bit more detail, at least as to the timeline of Plaintiff's injury and Dr. Tidwell's involvement in his treatment.

Generally, a court should not consider extrinsic evidence when ruling on a motion to dismiss unless a document "is central to the plaintiff's claim" and incorporated by reference in the complaint. *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368-69 (11th Cir. 1997) ("[T]he analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto."). The records Plaintiff provides certainly are central to his claims, and Defendants do not contest their authenticity. In fact, they

12

reference some of the records in their motion to dismiss. Def. Mot. at 3, 11. The closer question, however, is whether the records were incorporated by reference given the original complaint was superseded by the filing of the operative pleading, with which the records were not provided. Although Plaintiff did not include a copy of the records with his third amended complaint, he references a specific administrative remedy in both his operative complaint and response, *see* Am. Compl. at 5, 7, 12; Pl. Resp. at 1-2, but a copy of that administrative remedy appears on the docket only with the original complaint, *see* Doc. 1 at 10.

Given Plaintiff himself relies upon records he filed with his original complaint, the records are relevant to the claims, and no party disputes their authenticity, the Court will consider them. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (holding a court may consider extrinsic evidence when ruling on a 12(b)(6) motion without converting it into a Rule 56 motion if the evidence "is (1) central to the plaintiff's claim and (2) undisputed").

Much of Plaintiff's medical care is summarized in grievance records, including responses. According to those records, Plaintiff had an x-ray shortly after his injury, which "showed no broken, fractured or dislocated bones." Doc. 1 at 11, 13. Plaintiff returned to the clinic on December 4, 2018, because he still had pain. *Id.* at 13. The medical provider (unnamed) found Plaintiff had

full range of motion in his hand. *Id.* at 18. Plaintiff was given an Ace wrap and told to apply warm compresses, purchase over-the-counter pain medications, and return if needed. *Id.* at 13, 18. As of January 8, 2019, Plaintiff had not purchased Motrin at the commissary. *Id.* at 18. Plaintiff failed to show for a follow-up appointment on January 16, 2019. *Id.* at 11. Plaintiff submitted grievances on January 29, 2019, and March 18, 2019, questioning the negative results of the November x-ray because his bone was sticking out and his hand remained swollen. Doc. 1 at 10, 12.[6]

Plaintiff also provides some medical records. On May 16, 2019, Dr. Tidwell evaluated him. *Id.* at 19. Dr. Tidwell ordered x-rays for a suspected "possible dislocation or ligamental damage to the saddle joint [of the right thumb]." *Id.* Dr. Tidwell prescribed ice and Motrin for pain and referred Plaintiff to a hand surgeon. *Id.* As to the surgical consultation, Dr. Tidwell noted, "[P]lease try to schedule early." *Id.*

Plaintiff was seen at a hand center on July 8, 2019. *Id.* at 20. The surgeon recommended surgery for "reconstruction and stabilization of the [right] thumb CMCJ [carpometacarpal joint]." *Id.* It appears Dr. Tidwell knew of the surgical request because the medical note indicates Dr. Tidwell was required

---

[6] Plaintiff submitted a third grievance form (an appeal), but it is illegible. Doc. 1 at 14.

to "cosign" the order. *Id.* at 21. The next medical record Plaintiff provides is dated April 15, 2020, when he returned to the hand center for a follow-up. *Id.* at 23. Dr. Cynthia Harding noted Plaintiff was to be scheduled for right thumb surgery "once authorized by Coleman facility." *Id.* There is nothing in the record indicating why surgery had not yet been scheduled or whether a particular official at Coleman had denied the request. *See id.* The medical record is confusing because it says that Plaintiff "elected surgery" but also that Plaintiff "elected conservative treatment, and does not yet want surgery." *Id.* Dr. Harding gave Plaintiff an injection. *Id.*

Liberally construing his allegations, Plaintiff does not allege Dr. Tidwell, whom it appears treated Plaintiff only one time, provided care that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Harris*, 941 F.2d at 1505. Importantly, Plaintiff does not fault Dr. Tidwell for the initial misdiagnosis, which caused his thumb to heal in a malunited position. Even if Dr. Tidwell were responsible for an alleged misdiagnosis, however, such conduct constitutes medical negligence, not deliberate indifference. *See Estelle*, 429 U.S. at 106. If anything, Plaintiff's own records show Dr. Tidwell was the opposite of indifferent to Plaintiff's injury: Dr. Tidwell ordered additional x-

15

rays and referred Plaintiff to a surgeon for an appointment to be scheduled as soon as possible. *See* Doc. 1 at 19.

To the extent Plaintiff wanted stronger pain medication or a splint/cast while awaiting the surgical consult, he alleges at most a difference in medical opinion, which is not actionable as an Eighth Amendment violation. *See, e.g.*, *Estelle*, 429 U.S. at 106-07. Moreover, while Plaintiff faults Dr. Tidwell for not doing more, Plaintiff does not allege he complained to Dr. Tidwell that conservative measures, including over-the-counter pain medications, were not effective, and that, with such knowledge, Dr. Tidwell ignored him or refused to further evaluate him. *See* Am. Compl. at 5, 12.

It is clear from the records that surgery was recommended on July 8, 2019, but it either was not approved or not scheduled. *See* Doc. 1 at 20, 24-25. However, Plaintiff does not allege Dr. Tidwell was responsible or, if he were responsible, that the failure to schedule surgery was anything more than an oversight. *See id.* For instance, he does not allege Dr. Tidwell told him he (Dr. Tidwell) would not approve surgery. In fact, it appears from the records Plaintiff himself provides that Dr. Tidwell wanted Plaintiff to have surgery given Dr. Tidwell referred Plaintiff to the surgeon and noted in the referral that an appointment should be scheduled as soon as possible. *Id.* at 19. Moreover, by the time Plaintiff treated with Dr. Tidwell and the surgeon, his

hand had already healed improperly, meaning any delay attributable to Dr. Tidwell did not cause the injury of which Plaintiff complains. *Id.* at 19-20.

Because Plaintiff fails to state a plausible claim against Dr. Tidwell, Defendants' motion is due to be granted in part to the extent that Dr. Tidwell is entitled to qualified immunity.

### ii.     Nurse Jackson

Plaintiff alleges he complained to Nurse Jackson "on more than one occasion" that he still had pain and swelling even though the initial x-ray was negative, but Nurse Jackson provided no care or ignored him. Am. Compl. at 12; Pl. Resp. at 3. In his response, Plaintiff explains he continued going to "medical for the same complaint . . . and [Nurse Jackson] . . . [would] call other inmates to be seen but not [him]." Pl. Resp. at 4. Accepting these allegations as true, Plaintiff does enough to state a plausible deliberate indifference claim against Nurse Jackson. *See, e.g.*, *McElligott*, 182 F.3d at 1257 ("[P]rison officials with knowledge of the need for care may not, by failing to provide care . . . cause a prisoner to needlessly suffer the pain resulting from his or her illness."). Accordingly, Defendants' motion is due to be denied in part as to Nurse Jackson's invocation of qualified immunity.

17

### iii. Defendants Cheatham & Dunbar

It appears Plaintiff proceeds against both Warden Cheatham and Captain Dunbar because they are supervisors; neither is a medical provider. Plaintiff alleges Warden Cheatham did not authorize or approve hand surgery as requested by the surgeon. *See* Am. Compl. at 12. He says Warden Cheatham had knowledge of the surgical request through a grievance he filed. *Id.* But the grievance Plaintiff references—administrative remedy #966047-F1—was dated January 29, 2019, before Plaintiff had even seen the surgeon. *Id.* To the extent Plaintiff contends Warden Cheatham should have "discipline[d] staff to do what was needed [to address his] injury," *see* Am. Compl. at 12, such allegations suggest a claim based on a theory of vicarious liability, which is not actionable under *Bivens*. *See Ziglar*, 137 S. Ct. at 1860.

Even more, Warden Cheatham's response to Plaintiff's administrative remedy suggests he (the Warden) had no knowledge that Plaintiff required more or better treatment. *See* Doc. 1 at 11. On the contrary, Warden Cheatham learned that Plaintiff had been seen by a medical provider who advised Plaintiff to take over-the-counter pain medications because x-ray results were negative, and Plaintiff failed to show for a follow-up appointment. *Id.* As a non-medical provider responding to a medical grievance, Warden Cheatham was permitted to rely on the medical provider's expertise under the circumstances.

*See Williams v. Limestone Cnty., Ala.*, 198 F. App'x 893, 897 (11th Cir. 2006) ("[S]upervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care." (citing *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir. 1988))).

Similar to his allegations against Warden Cheatham, Plaintiff alleges Captain Dunbar knew about his hand injury but failed to ensure he "was receiving adequate medical care" by "disciplin[ing] staff and taking charge." Am. Compl. at 13. *See also* Pl. Resp. at 4-5. Such allegations suggest Plaintiff proceeds against Defendant Dunbar solely on a theory of vicarious liability. Plaintiff does not allege Captain Dunbar personally participated in a constitutional violation. For instance, he does not allege Captain Dunbar blocked his access to sick-call. *See* Am. Compl. at 12-13.

For the stated reasons, Plaintiff fails to state a plausible deliberate-indifference claim against Warden Cheatham and Captain Dunbar, and those Defendants, therefore, are entitled to qualified immunity.

Accordingly, it is now

**ORDERED**:

1. Defendants' motion to dismiss (Doc. 29) is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** to the extent Defendants

Tidwell, Cheatham, and Dunbar are entitled to qualified immunity and the claims against them are **dismissed with prejudice**. The motion is otherwise **DENIED**.

2. The **Clerk** shall terminate Defendants Tidwell, Cheatham, and Dunbar as parties to this action.

3. Defendant Jackson shall file an **answer** to Plaintiff's third amended complaint (Doc. 13) within **twenty days** of the date of this Order.

**DONE AND ORDERED** at Jacksonville, Florida, this 31st day of October 2022.

                                               BRIAN J. DAVIS
                                        United States District Judge

Jax-6
c:    Antowan Thorne
      Counsel of Record